## HUGHES v. THE STATE.

1. The verdict was authorized by the evidence.
2. Under the facts of this case and in view of the general charge, it was not error to instruct the jury that "it would be justifiable homicide to kill to prevent a felony upon one's habitation or property or under such circumstances, of which the jurors are the sole judges, as would arouse the fears of a reasonable man or woman that a felony was about to be committed against his or her property or habitation or person."
3. Nor was it error, under the facts of the case and the general charge, to instruct the jury that "it would be voluntary manslaughter to unlawfully kill, under like circumstances, to prevent a misdemeanor upon one's habitation, property, person or family, or a trespass upon one's property, habitation, person or family, less than a felony."

No. 4455. FEBRUARY 20, 1925.

Murder. Before Judge Howard. Fulton superior court. June 14, 1924.

*H. A. Allen,* for plaintiff in error.

*George M. Napier, attorney-general, John A. Boykin, solicitor-general, T. R. Gress, assistant attorney-general, E. A. Stephens,* and *R. H. Pharr,* contra.

HILL, J. Mrs. Ida Hughes was indicted for the murder of Mrs. M. C. Hughes. The jury trying her returned a verdict of guilty, without recommendation, and she was sentenced to be hanged. The defendant made a motion for a new trial on the usual general grounds, and assigned error in the amended motion on three excerpts from the charge of the court.

1. We are of the opinion that the evidence authorized the verdict of guilty. E. J. Wynn, a witness for the State, testified as follows: "I live at Hapeville. I am a policeman. I have seen the defendant, Mrs. Ida Hughes. I saw her on the day of the 30th of December, 1923, at her home. Her home is located near Hapeville

just off of Virginia Avenue, in Fulton County, Georgia. On the 30th day of December, 1923, I saw her shoot Mrs. M. C. Hughes. We went there, my partner and I, Mr. Honea, went there to serve a warrant, a possessory warrant for some things the old lady—We went there to serve a paper. We went in the home of the defendant. My partner and Mrs. Hughes and Mr. Frank Hughes and the old lady were with me at the time. When we first went in Frank's house he was not at home. I told Mrs. Ida Hughes what we had come for, and let her read the paper. She asked me to wait until her husband came. We waited. Then he didn't come, so she and my partner went after him. In a short time they came back. Then we went in and searched some trunks. We went in and searched some trunks for some things that Mrs. M. C. Hughes claimed they had taken from her. Mrs. M. C. Hughes was with us at the time, and she went in the house with my partner and me. She looked in the trunks herself; she took these things out the trunk herself. We made a list of the things she took out. The defendant was present while we were doing this. I know only by a list I have what we took out, and that was some clothing, pillow-slips and sheets, one or two counterpanes, a few dishes, glassware. The defendant was there, and could see everything that was going on. She did not do anything. She told us it was all right. She told Mrs. Hughes to get anything she thought was hers, that it was perfectly all right. Mrs. Ida Hughes, the defendant in this case, and Mr. Frank Hughes both told Mrs. M. C. Hughes to go ahead and get anything she wanted that was hers. We had gotten all there was in the trunk that she claimed was hers, and Mrs. Ida Hughes walked back in the other room and came back with a pistol and fired it and killed Mrs. Hughes. I saw her when she shot. The bullet hit Mrs. Hughes on the left side of the head above the ear, and came out on the right side in the back. She was kneeling down at the tray of the trunk close to the door. The tray was almost in the door, one edge of the door, the left side of the door. Mrs. Ida Hughes and Mrs. M. C. Hughes, at the time Mrs. M. C. Hughes was shot, were not more than three or four feet apart. The door, that Mrs. Ida Hughes came through, with reference to the front part of the house, was the second door in the building. The house is built—it is what we call a 'shotgun' building. There was three rooms to it. We were in the front room. That is where

the trunks were. This door is almost in the center of the next room, and has a partition on each side. Miss Ida stepped from behind the partition. With reference to this map or diagram, here is the front door. There was one trunk over here farther back. This other trunk was closer to the door. The bed was back here. We searched that trunk, and had almost finished this one—we had gotten everything out except what was in the tray, knives, forks, and a few dishes that Mrs. Hughes took out. Miss Ida came to this bed, so she said, and got this pistol and came to the door. She just came to the door. She was standing at the edge of the door when she fired the shot. Mrs. M. C. Hughes' body was almost at the door. She was facing that door. Her head was facing sideways. Mrs. Ida Hughes had that pistol when I took it away from her. This is the pistol. When I saw it Mrs. Ida Hughes had the pistol in both hands this way, and fired with both hands. The door would be here. The partition is back here. When I saw Mrs. Ida Hughes she stepped out from behind the partition into that door. She had the pistol in both hands. Yes, I saw Mrs. M. C. Hughes at the time she was shot. She died immediately. She did not say anything. That happened on the 30th day of December of last year. The place where this shooting occurred is located in Fulton County, Ga. The defendant did not say anything to anybody."

L. P. Honea testified for the State as follows: "I am a policeman at Hapeville. I know the defendant Mrs. Ida Hughes. I saw her in December, 1923. I saw her over at her house. I went over there with the chief with a warrant to search. Mr. Wynn is the chief. I don't remember the date. The defendant, Mrs. Ida Hughes, was at home when I arrived there. There wasn't anybody else there. Frank Hughes, her husband, was not there. Yes, I saw Frank Hughes that day. I went up to a house where the old lady Mrs. Hughes, it was said, had moved to, and he was up there. I don't remember the street. Yes, it was the house where Mrs. Hughes, the deceased, had moved to. He was there. He came on down to his home. Mr. Wynn and his wife were at his home. Mr. Wynn showed him the warrant, then we proceeded to look for the goods. I was in the yard when Mr. Wynn showed Mr. Hughes the warrant. In Frank's yard. Mrs. Ida Hughes was there. He said, 'Go ahead and look.' Yes, we went ahead. Miss Ida Hughes shot

and killed the old lady, Mrs. Hughes. Ida Hughes is the defend-
ant in this case, and Frank's wife. I saw the shooting. I was
something like sixteen or eighteen feet from Mrs. Hughes at the
time the shooting occurred. Myself, Mr. Wynn, and Mrs. Hughes,
and Frank's wife were in the house at the time. Nothing was said
between Mrs. Ida Hughes and Mrs. M. C. Hughes just prior to the
shooting. No words were passed between them. Yes, I know what
articles we had taken out of the house, or out of the trunk, at the
time of the shooting. (Producing a paper) Two bed spreads, one
sheet—four sheets, two shirt-waists, six middies, one apron, one
petticoat, one gown, eleven towels, one blue-beaded silk dress, one
black silk dress, ten house dresses, and one plaid dress, four silk
waists, one voile waist, two counterpanes, one piece of underwear,
a lot of dishes, one five-passenger Ford touring-car. Mr. Frank
Hughes was in the Ford touring-car when I found him up at the
house where they said his mother had moved to. At the time of
the shooting it was standing in front of the house. Nothing was
said nor were any objections made at any time during the taking
out of these articles. I did not see Frank Hughes at the time the
shooting occurred. He came in as quick as it happened. When
he came in he walked across the room to his wife and put his arm
around her and kissed her. He asked her why she did it. Frank
asked Mrs. Hughes, his wife; she said, 'I did it. It is all over.'
. . Before she had finished examining the things in that second
trunk, Mrs. Ida Hughes went in that middle room. She was
gone only a short time when she come back with a pistol. She was
gone, I don't know how long—a couple of minutes, something like
that. When she came back Mrs. M. C. Hughes was kneeling down
going through the contents of that trunk. Right close to that door
that she came out of from the middle room. Then it was that she
shot her. While she was in the act of going through the contents
of that trunk. I did not hear any conversation at all between Mrs.
M. C. Hughes and Mrs. Ida Hughes. Not a word was spoke, that
I remember. It seems like Mrs. M. C. Hughes asked about another
trunk. She said that there was another trunk missing. I think
that is all she said about it. I don't remember what Mrs. Ida
Hughes· said when Mrs. M. C. Hughes said another trunk was
missing. She might have said something about not knowing any-
thing about that other trunk. No, Mrs. M. C. Hughes did not tell

her she was a damn lie, that she did know. No such thing happened. I am sure of that. I said I was not sure about the conversation—I did not remember the conversation. I do remember that something was said about a trunk. I disremember what it was. There was something asked about another trunk. I think it was a good bit before Mrs. Ida Hughes went in that middle room."

The defendant in her own behalf made a long statement covering twenty typewritten pages, most of which narrated the story of her life and where she had lived from time to time, and concluded: "First Mr. Wynn showed him [Frank Hughes] the possessory warrant. He said, 'Mr. Wynn this is not a search warrant. You have not got any right at all to go in my house. There is nothing in there that my mother could not get, mine nor Ida's or nobody's else, if there should be something there, but there is nothing in there but what belongs to Ida and myself.' She just shook her head and kept humming something. I was on the porch. He said to Mr. Quinn, 'Don't you polices go prowling around my house.' They just ignored him and went in. Mrs. Hughes went in. She had come out of Mrs. Turner's then. So I went in there. I stood in there at the end of my trunk right close to the middle door. When I last seen my husband he was on the porch, and when I last seen my husband he was still at his car, still standing by the side of it. When they asked about this trunk Mr. Quinn said, 'Whose trunk is that?' I said, 'My husband's.' He said, 'Whose trunk is this?' I said, 'His too, his trunk and mine.' The old lady peeped around, Mrs. Hughes, Mother Hughes. I did not know what she was fixing to do. I was just looking on. I did not know what they were going to do. The police says, 'You say this is your trunk?' I said, 'Yes, mine and my husband's trunk.' He looked at Mrs. Hughes. She opened up the tray, the lid. She throwed the lid off, and she commenced throwing out my clothes. She throwed out everything I had in the trunk on the floor, this way and that way, everything that I had fitten to wear. Any that she throwed in the floor she would say, 'That is mine, that is mine.' I started to say something. Mr. Wynn said, 'Will you keep your damn mouth shut? She knows what she is doing.' I was afraid to say anything else, it hurt me so. In fact I did not know what to do. I could not say nothing. I started out on the porch, and Mr.

Wynn caught me and snatched me back. He said, 'You aint got no business out here. I will give you orders when to go out.' I stood there and watched Mother throw every rag of clothes I had on the floor. It hurt me so bad I didn't know what to do. She looked at me and says, 'Ida, where in the hell is my other things?' I said 'Mother Hughes, I have not got nary one of your trunks.' I said 'Frank and myself never had but two trunks since we were married.' She said, 'It's a damn lie, Chief.' She turned to Mr. Wynn and said that. She said, 'I know damn well you got my things, and I am going to have them.' She kept on. She shook her finger in my face and said, 'You are no lady, Ida Allen. You just as well prepare for this, if you don't get these things up.' It hurt me so bad I don't remember anything else I did. The next I remember was when the police was helping me in the car. I asked —I seen my husband crying—I asked him what is the matter. He didn't say nothing. Mr. Wynn said, 'You know what is the matter. You have killed your mother-in-law.' It shocked me so bad I didn't know what to do. I don't remember whether I said another word coming on to the jail-house or not. I don't remember another word that I said. I don't know whether I killed my mother-in-law or not. I don't say I did, and don't say I didn't; but if I did, I am sorry I killed her." In rebuttal the State offered several witnesses who contradicted the statement of the defendant in material points. From a careful examination of the evidence we are of the opinion that the jury was authorized to find the defendant guilty as charged.

2. Error is assigned upon the following excerpt from the charge of the court: "It would be justifiable homicide to kill to prevent a felony upon one's habitation or property or under such circumstances, of which the jurors are the sole judges, as would arouse the fears of a reasonable man or woman that a felony was about to be committed against his or her property or habitation or person." The second ground of the amended motion complains of the following charge: "It would be justifiable homicide to kill to prevent a felony upon one's habitation or property or under such circumstances as to arouse the fears of a reasonable man or woman that a felony was about to be committed upon his or her habitation, person, or property." The third ground of the amended motion complains of the following charge to the jury: "It would be voluntary

manslaughter to unlawfully kill, under like circumstances, to prevent a misdemeanor upon one's habitation, property, person or family, or a trespass upon one's property, habitation, person or family less than a felony." These three grounds of the motion for new trial were argued together by counsel for the plaintiff in error, "because they involve the same principle of law." It is insisted that the charge quoted in ground one of the amendment was error, because the court instructed the jury "in substance and effect" that it would not be justifiable homicide to kill one who was about to commit a crime less than a felony on his habitation or under such circumstances as would lead a reasonably courageous man to believe that a crime less than a felony was about to be committed on his habitation. It is insisted that the court practically instructed the jury that if the deceased was committing a crime less than a felony on the habitation of the prisoner, then she would not be justified in taking the life of the deceased. The language quoted in the second ground is criticised because it is insisted that the court charged the jury that it would be justifiable homicide to kill to prevent a felony upon one's habitation or property or under such circumstances as to arouse the fears of a reasonable man or woman that a felony was about to be committed upon his or her habitation, person, or property. This criticism is substantially the same as that directed to the first charge complained of. The third ground complains that the charge there set out was error for the reason that it is justifiable homicide under certain circumstances for a person to kill another to prevent an offense less than a felony on his habitation or some one dwelling or being therein, or under circumstances sufficient to lead a reasonably courageous man to believe that an offense less than a felony was about to be committed on his habitation, or some one dwelling or being therein.

In no view of the evidence can it be said that there was an attack on the person or habitation of the defendant, made by the deceased, or a demonstration such as to excite the fears of a reasonable man or woman that it was the intention of the deceased to commit a felony on the defendant or any member of her family, or her property. There was no resistance or remonstrance, so far as the evidence discloses, to the entrance of the deceased to the house of the defendant, or to the trunk where the clothing was located. On the

contrary the evidence discloses that the defendant and her husband (who was a son of the deceased) told the deceased to go ahead and get whatever she thought was hers out of the trunk, which she was proceeding to do without hindrance, when she was shot without warning by the defendant. So that there was no attempt to commit a felony, so far as the evidence discloses, on the part of the deceased, or an act less than a felony—no attempt in a riotous or tumultuous manner to enter the habitation of the defendant for the purpose of assaulting or offering personal violence to the defendant or her husband. In these circumstances, the charge of the court was not error as against the defendant, and was more favorable under the evidence than the defendant was entitled to. It was probably given on account of the statement of the accused. Even under the statement of the defendant, no attack on the person, habitation, or property was made by the deceased, who was permitted to enter the house and trunk to get clothing she claimed belonged to her.

We are of the opinion, taking the entire charge of the court in consideration, that the excerpts from it are not open to the criticisms directed against them, in view of the facts of the case. The judge instructed the jury: "Gentlemen, as applied to one of the defenses in this case, the court reads to you a section of the code on justifiable homicide: 'Justifiable homicide is the killing of a human being by commandment of the law in execution of public justice; by permission of the law in advancement of public justice; in self-defense or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either; or against any persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein.' A bare fear of any of those offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man or woman, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge. It would be justifiable homicide to kill to prevent a felony upon one's habitation or property or under such circumstances, of which the jurors are the sole judges, as would arouse the fears of a reasonable man or woman that a felony

was about to be committed against his or her property or habitation or person. A felony is a crime punishable by death or by confinement in the penitentiary of this State. Another section of the code provides: 'If after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another can not be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading the property or habitation of another; but it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious injury was intended, or might accrue' to the person, property, or family of the person killing.' Now, gentlemen, how all these matters are is for the jury to determine from the testimony in the case and the defendant's statement, giving the defendant the benefit of any reasonable doubt that you may have in your minds. Now, gentlemen, another section of the code applicable to this case is the definition of voluntary manslaughter: 'Manslaughter is the unlawful killing of a human creature, without malice, either express or implied, and without any mixture of deliberation whatever, which may be voluntary, upon a sudden heat of passion, or involuntary, in the commission of an unlawful act, or a lawful act without due caution and circumspection;' voluntary manslaughter being the only grade of manslaughter involved in this case. Gentlemen, it would not be murder by [or] voluntary manslaughter to voluntarily kill without malice an officer or person deputized or authorized by such officer in his presence to prevent an illegal seizure of one's property or habitation. It would be justifiable homicide to kill to prevent a felony upon one's habitation or property or under such circumstances as to arouse the fears of a reasonable man or woman that a felony was about to be committed upon his or her habitation, person, or property. It would be voluntary manslaughter to unlawfully kill, under like circumstances, to prevent a misdemeanor upon one's habitation, property, person, or family, or a trespass upon one's property, habitation, person, or family, less than a felony. It would not be murder, but voluntary manslaughter, to unlawfully kill an officer, or person deputized or authorized by such officer, to prevent the execution of a legal process in an unlawful manner, or an unlawful process, by such unauthorized person, or by such officers, if necessary to prevent such a trespass less than a felony. A police officer or police officers

of the city of Hapeville would have no legal authority to execute the possessory warrant referred to in this case, or to take charge or possession of any property or article described therein, nor could such officer or officers legally delegate such authority to the deceased, the plaintiff in such possessory warrant, to do so in the presence of such officers or under their direction, unless done with the consent of the defendant, if the defendant was in possession of such property. You should look to the evidence and the defendant's statement, and determine whether or not the deceased was unlawfully taking possession of any property or article in possession of the defendant, or whether or not she was doing so by the defendant's consent. If not with the consent of the defendant, the act of the deceased in taking possession of such property in the home of the defendant would be an unlawful seizure of such property, notwithstanding the said officers may have had a legal possessory warrant therefor and may have authorized the deceased to seize or take possession of said property in their presence."

Considering the charge of the court in its entirety we are of the opinion that the excerpts complained of were not erroneous for any reason assigned. *Judgment affirmed. All the Justices concur.*